THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ANTONIO ROIG, SUCRS., *S. en C.,* Defendant and Appellant.

No. 8803.   Argued November 2, 1943.—Decided February 1, 1944.

*James R. Beverley, R. Castro Fernández,* and *José López Baralt* for appellant.   *M. Rodríguez Ramos, Acting Attorney General, A. E. Franco Cabrero, Deputy Attorney General,* and *Pablo Defendini* for defendant.

MR. JUSTICE TODD, JR., delivered the opinion of the court.

The legal problem brought before us for decision is whether or not Act No. 221, approved May 12, 1942, by means of which all sugar companies in Puerto Rico were declared by our Legislature to be public service enterprises[1], violates the due process clause contained in §2 of our Organic Act, by requiring the respondent partnership, which alleges that it is not serving, nor wishes to serve the public at large, to obtain a franchise from the Public Service Commission, and thereby submit to the provisions of said law. The facts, briefly stated, are the following:

Antonio Roig, Sucrs., *S. en C.*, is the owner of two sugar mills in the district of Humacao—"Central Roig" and "Central "El Ejemplo." At "Central Roig," in addition to its own sugar cane, appellant grinds cane belonging to other *colonos,* and in so far as this mill is concerned it complied with the terms of Act No. 221, having petitioned for and obtained the franchise which said Act requires.[2] In regard

---

[1] "Section 12.—The manufacture, processing, and refining of sugar are declared public-service enterprises, and no natural or artificial person shall engage in Puerto Rico in such enterprises without having obtained a franchise in accordance with the provisions of this Act. Sugar companies, as they are defined in Section 2 of Chapter I of this Act, are declared public service companies, and every natural or artificial person that engages in Puerto Rico, as owner, lessee, or otherwise, in the manufacture, processing, or refining of sugar is likewise declared to be a public service company."

Section 2 of the Act reads thus:

"Section 2.—The term 'sugar company', as used in this Act, means any natural or artificial person who, in Puerto Rico, in accordance with the provisions of this Act, engages as owner, lessee, operator, administrator, possessor, or otherwise, in the manufacture, processing, or refining of sugar. The term 'sugar company' also includes any natural or artificial person who in any manner acquires sugar cane for conversion into raw or refined sugar, or acquires raw sugar for refining, as well as any natural or artificial person who in any manner acts as an intermediary, business agent, or broker between a sugar company and its *colonos.* The sugar companies shall not, as regards any business transaction made, or any property belonging to it, outside of Puerto Rico, be subject to the provisions of this Act; nor shall the provisions of this Act be construed to apply to any matter or thing with regard to which Congress may have decided with exclusion of the power of Puerto Rico."

[2] "Section 18.—Thirty days after this Act takes effect, every sugar company, as defined in Section 2 of Chapter I of this Act, and every person engaged

to "Central El Ejemplo" the appellant refused to petition for a franchise alleging that due to the fact that it does not grind, nor has the intention or desire to grind other sugar cane than its own, the Legislature lacks power to require it to obtain said franchise and to impose upon it the regulations contained in Act No. 221; that its business is of

---

in Puerto Rico in the manufacture, processing, or refining of sugar, shall be under the jurisdiction and subject to the authority of the Commission, and no natural or artificial person may engage in the manufacture processing or refining of sugar unless he requests and obtains from the Commission a franchise authorizing him to do so. Every franchise, privilege, or concession for engaging in Puerto Rico in the manufacture, processing, or refining of sugar shall be issued by the Commission according to the rules and regulations that the Commission may establish in accordance with the provisions of the Organic Act and of this Act.''

''Section 66.—Three (3) months after the date on which this Act takes effect, no natural or artificial person may engage in Puerto Rico in the manufacture, processing, or refining of sugar unless he has obtained, a franchise which, with a provisional nature, shall be issued to him by the Commission which is hereby authorized and directed to issue such franchise with a provisional nature to every natural or artificial person engaged in the manufacture, production, processing, or refining of sugar, who may apply therefor within the thirty (30) days following the date on which this Act takes effect. Such franchise with a provisional character shall be adjusted to the provisions of this Act and to the rules and regulations that the Commission may prescribe, except that it shall not have to contain, necessarily, limitations as to the production zone of the party applying therefor. Such provisional franchise shall be valid for one year only.

''Within the year following the granting of such provisional franchise, the Commission may substitute it, on petition of the grantee, which shall be filed with the Commission within the first three months of said year, by a final franchise in which shall necessarily be included the provisions which, as to the production zone of the party applying therefor, may have been determined by the Commission, and all other provisions that the Commission may consider it advisable to include in such final franchise in accordance with this Act and with the Organic Act. Fifteen months after the date on which this Act takes effect, no natural or artificial person may engage in Puerto Rico in the manufacture, processing, or refining of sugar unless he has requested and obtained from the Commission the granting of such final franchise. Every natural or artificial person or every sugar company and every officer, employee, or agent of the same who violates any of the provisions of this section shall be guilty of a misdemeanor and, upon conviction, shall suffer the penalty of imprisonment in jail for not less than one month nor more than one year, or a fine of not less than two thousand (2,000) dollars, or both penalties, in the discretion of the court.''

a private nature, and one in which the public cannot be interested, and that, therefore, it cannot be converted into a public enterprise by mere legislative *fiat*.

The Attorney General of Puerto Rico, acting in accordance with § 55 of Act 221[3], filed in the lower court a petition for an injunction in the name of The People of Puerto Rico, wherein he prayed that Antonio Roig, Sucrs., *S. en C.*, be enjoined from grinding its sugar cane unless it previously obtained said franchise, thereby submitting to the jurisdiction of the Commission. The lower court granted the injunction and it is from that judgment that this appeal has been taken.

▆▆▆▆ Appellant assigns four errors, and later consolidates the first three into one which reads as follows:

"Act No. 221 of May 12, 1942, is unconstitutional and void in so far as it tries to convert a private business into a public service enterprise, under the guise of the power to regulate within the police power."

Before delving further into the legal problem before us it is well to note that appellant admits it does not challenge "the authority of the Legislature of Puerto Rico, within the police power, to regulate a private business affected with a public interest, such as is and has always been the case with the sugar industry of Puerto Rico." It argues, further, that the lower court's error consists "in having mistaken the Legislature's authority, within the police power, to regulate a business affected with a public interest—authority which it undoubtedly has—with the authority to force private property to be dedicated to a public use, without the consent of

---

[3] "Section 55.—The Attorney General, in addition to the exercise of the powers and duties conferred upon him by law, shall also, upon request of the Commission or of his own motion, proceed in the name of The People of Puerto Rico, by mandamus, injunction, or quo warranto, or other appropriate remedy at law or in equity, to restrain violations of the provisions of this Act or of the orders of the Commission or of the judgment, orders, or decrees of said court, or to enforce obedience thereto."

its owner—authority which it does not have, according to all the decisions of the U. S. Supreme Court. The lower court was so impressed by the great public interest with which the sugar industry in Puerto Rico is affected that it completely forgot to consider the second indispensable condition to the requiring of a franchise, to wit: that the owner of the business *dedicate his property to serving the public or that he actually serve the public.*" Therefore, the appellant's contention is "that the Legislature of Puerto Rico lacks authority to convert a private business into a public service enterprise, so long as its owner refrains from serving the public or dedicating it to the public service, even though (said business) is affected with a public interest." So that appellant admits, at least by implication, that all sugar mills in Puerto Rico, such as its own "Central Roig," wherein cane belonging to *colonos* is ground, may validly be declared public service companies, but not so in the case of those mills, such as "Central El Ejemplo," wherein cane belonging to *colonos* is not ground. Also, and this is of great importance in deciding this case, appellant expressly concedes the authority of the Legislature, within its police power, to reasonably and justly regulate prices, contracts, wages and hours, even in the case of "Central El Ejemplo." To sum up, therefore, appellant only challenges, according to paragraph 5 of its answer, the power of the Legislature to require it to obtain a franchise "in order to grind its own sugar cane at its own sugar mill."

We see, therefore, that no controversy whatsoever exists in regard to the fact that the sugar industry in Puerto Rico is affected with a great public interest.

A large portion of the statement of motives contained in Act No. 221, does nothing more than transcribe paragraphs from the opinions of the Insular and Federal courts wherein judicial notice is taken of the importance of the sugar industry to the economy of the Island. In order not to unduly

extend this opinion we limit ourselves to noting the origin of said paragraphs.[4]

However, the Legislature's declaration that a business is affected with a public interest, ratified by the courts, and the acceptance of this fact by the parties in a particular case, is not conclusive as to whether or not the regulation contained in the law is justified. Not only the regulation, but even the circumstances which may be invoked as furnishing grounds for declaring that a private business is affected with a public interest, when this fact is not admitted, are always subject to judicial inquiry, not in order that we may have our point of view on the question prevail, but in order for us to pass upon the reasonableness of the legislative determination thereon.

Since in the case at bar the controversy has been narrowed down to determining the reasonableness, justification or power of the Legislature to declare the appellant's business to be a public service enterprise and subject to the obtainment of a franchise, we consider it appropriate to make a résumé of the origin and development of the debated phrase "affected with a public interest," as used in relation to a private business. We will say at the outset that the decisions of the U. S. Supreme Court on the matter have been the subject of diverse essays and comments which show the importance which the doctrine has been accorded. We cite below some of those annotations for a more extended study of the matter.[5] It is enough to say here that it was in the famous case of *Munn* v. *Illinois,* 94 U. S. 113 (1873), where the phrase was first ingrafted into American constitutional law, making

---

[4] Opinion of this Supreme Court in *People* v. *Rubert Hnos. Inc.,* 53 P.R.R. 741; opinion of this District Court of San Juan in *Plata Sugar Co.* v. *Fernández García;* opinion of the Circuit Court of Appeals in *Vidal* v. *García,* 104 F.(2d) 606.

[5] Hamilton, Affectation with Public Interest, 39 Yale L. Journal 1089 (1930); McAllister, Lord Hale and Business Affected with a Public Interest, 43 Harvard L. Rev. 759 (1929); Harbeson, The Public Interest Concept in Law and Economics, 37 Mich. L. Rev. 181; Robinson, The Public Utility; A prob-

it a part of the police power of the state. In that case Mr. Justice Waite applied the almost forgotten assertion of Lord Hale, contained in his treatise *De Portibus Maris*, to the effect that the owners of a wharf which all persons are compelled to use in order to load or unload their goods cannot charge arbitrary and excessive fees due to the fact that this necessity on the public's part has affected the wharf with a public interest and it has ceased to be *juris privati* only.

The court, applying this test, held that grain elevators in the State of Illinois were affected with a public interest and that, therefore, the Legislature could, without violating the Fourteenth Amendment to the Constitution, fix the maximum compensation which the owners of said elevators could charge for storing the grain. In expounding the doctrine the Court said, at page 126:

"Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

However, through the years and in a series of cases which we cite below[6] the phrase was held applicable, or not

lem in Social Engineering (1928) 14 Cornell L. Q. 1; Keezer, The "Public Interest" Doctrine (1927), 25 Mich. L. Rev. 596; Robinson, The Public Utility Concept in American Law (1928), 41 Harv. L. Rev. 277; Powell, State Utilities and The Supreme Court (1931); 29 Mich. L. Rev. 811, 1001; Goddard, The Evolution and Devolution of Public Utility Law (1934), 32 Mich. L. Rev. 577; Hale, The Constitution and the Price System; Some Reflections on *Nebbia* v. *New York* (1934), 34 Columbia L. Rev. 401; Finkelstein, From *Munn* v. *Illinois* to *Tyson* v. *Banton:* A study in the Judicial Process (1927), 27 Columbia L. Rev. 769; Goldsmith and Winks, Price Fixing: From Nebbia to Guffey, Selected Essays on Constitutional Law, vol. 2, p. 531.

[6] *Brass* v. *Stoerer,* 153 U. S. 391; *German Alliance Co.* v. *Lewis,* 233 U. S. 389; *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170; *Wolff Packing Co.* v. *Industrial Court,* 262 U. S. 522; *Tyson* v. *Banton* 273 U. S. 418; *Ribnick* v. *McBride,* 277 U. S. 350; *Williams*

applicable,. to different businesses, until it became, as was said in the case of *Williams* v. *Standard Oil Co., supra,* the "established test by which legislative power to fix the prices of commodities, use of property and services, must be measured." In spite of this, Justices Holmes, Brandeis, and Stone in several dissenting opinions written in some of the cited cases, were in agreement that the phrase did not have the limited application which the majority of the U. S. Supreme Court accorded to it under the circumstances of each case and according to its narrow point of view. Thus in the *Tyson* case, *supra,* Mr. Justice Holmes, with his characteristic habit of going to the roots of the facts, and of the problems which lie within the province of the Legislature and not of the courts, stated as follows:

"The notion that a business is clothed with a public interest and has been devoted to a public use is little more than a fiction intended to beautify what is disagreeable to sufferers. *The truth seems to me to be that, subject to compensation when compensation is due, the legislature may forbid or restrict any business when it has sufficient force of public opinion behind it."* (Italics added.)

With as much or greater clarity, Mr. Justice Brandeis, in his dissenting opinion in the *New State Ice Co.* case, *supra,* in which Mr. Justice Stone concurred, expressed, in our judgment, the true scope of the doctrine. In that case the State of Oklahoma passed a law declaring the manufacture, sale, and distribution of ice to be a public business and that none would be allowed to engage in it without first obtaining a license from the Corporation Commission. The majority of the Court held that the law was unconstitutional because it considered the business to be one of a private nature and not affected with a public interest; that while the business might be subjected to reasonable regulation the same was not

v. *Standard Oil Co.,* 278 U. S. 235; *New State Ice Co.* v. *Liebmann,* 285 U. S. 262; *Nebbia* v. *New York,* 291 U. S. 602; *Townsend* v. *Yeomans,* 301 U. S. 441; *Olsen* v. *Nebraska,* 313 U. S. 236.

a "paramount industry upon which the prosperity of the entire state in large measure depends."

Mr. Justice Brandeis' elaborate and learned dissent is too extensive to be cited in its entirety. We limit ourselves to transcribing its most important paragraphs. In regard to the power of the Legislature to convert a private business into a public service enterprise, he said:

"Oklahoma declared the business of manufacturing ice for sale and distribution a 'public business'; that is, a public utility. So far as appears, it was the first state to do so. Of course, a legislature cannot by mere legislative fiat convert a business into a public utility. *Producers Transportation* v. *Railroad Commission*, 261 U. S. 228, 230. But the conception of a public utility is not static. The welfare of the community may require that the business of supplying ice be made a public utility, as well as the business of supplying water or any other necessary commodity or service. If the business is, or can be made, a public utility, it must be possible to make the issue of a certificate a prerequisite to engaging in it.

"*Whether the local conditions are such as to justify converting a private business into a public one is a matter primarily for the determination of the state legislature.* Its determination is subject to judicial review, but the usual presumption of validity attends the enactment. The action of the State must be held valid unless clearly arbitrary, capricious or unreasonable (citing authorities). Whether the grievances are real or fancied, whether the remedies are wise or foolish, are not matters about which the Court may concern itself (citing authorities). A decision that the legislature's belief of evils was arbitrary, capricious and unreasonable may not be made without enquiry into the facts with reference to which it acted."

After analyzing the facts and conditions prevailing in Oklahoma in relation to the ice industry, Mr. Justice Brandeis goes on to consider the allegation that the business is one inherently private in its nature and that, therefore, the State cannot deny the right to its free exercise, and he answers the argument by saying that the businesses of supplying water, electricity and gas for sale are also inherently private in their nature, but that the supplying and selling of

any kind of article or service may become a matter of public concern, and he states: *"Whether it is or not, depends upon the conditions existing in the community affected.* If it is a matter of public concern, it may be regulated, whatever the business. The public's concern may be limited to a single feature of the business, so that the needed protection can be secured by a relatively slight degree of regulation. Such is the concern over possible incompetence, which dictates the licensing of dentists (citing authorities), or the concern over possible dishonesty, which led to the licensing of auctioners or hawkers (citing authorities). *On the other hand, the public's concern about a particular business may be so pervasive and varied as to require constant detailed supervision and a very high degree of regulation. Where this is true, it is common to speak of the business as being a 'public' one, although it is privately owned.* It is to such businesses that the designation 'public utility' is commonly applied; or they are spoken of as 'affected with a public interest.' *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 408." (Page 301, italics ours.) And going further into a consideration of the meaning of this phrase, he states:

"A regulation valid for one kind of business may, of course, be invalid for another; since the reasonableness of every regulation *is dependent upon the relevant facts. But so far as concerns the power to regulate, there is no difference in essence, between a business called private and one called a public utility or said to be 'affected with a public interest.' Whatever the nature of the business, whatever the scope or character of the regulation applied, the source of the power invoked is the same. And likewise the constitutional limitation upon that power. The source is the police power. The limitation is that set by the due process clause, which, as construed, requires that the regulation shall be not unreasonable, arbitrary or capricious; and that the means of regulation selected shall have a real or substantial relation to the object sought to be obtained. The notion of a distinct category of business 'affected with a public interest,' employing property 'devoted to a public use,' rests upon historical error.* The consequences which it is sought to draw from

those phrases are belied by the meaning in which they were first used centuries ago,[7] and by the decision of this Court, in *Munn* v. *Illinois,* 94 U. S. 113, which first introduced them into the law of the Constitution. *In my opinion, the true principle is that the State's power extends to every regulation of any business reasonably required and appropriate for the public protection. I find in the due process clause no other limitation upon the character or the scope of regulation permissible."* · (Italics ours.)

Justice Brandeis then proceeds to cite examples of businesses which in spite of the fact that they were private in nature at their inception, have from time to time been regulated, prohibited, or converted into monopolies or public service enterprises. He makes an analysis of the economic situation and depression prevailing due to the emergency created by the last war and the way in which economists were investigating its causes and examined anew the bases of the economic structure of the Nation in search of possible remedies, and he states that they were all in agreement that "irregularity in employment—the greatest of our evils—can·not be overcome unless production and consumption are more nearly balanced. Many insist there must be some form of economic control." He explains in detail and with numerous citations from economic experts the various solutions suggested and admits the dangers that these may bring in their wake, but he calls attention to the fact that the advances in the exact sciences and the achievements in invention are due to the process of experimentation, and says:

"Some people assert that our present plight is due, in part, to the limitations set by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. *There must be power in the States and the Nation to remould, through*

[7] Here Mr. Justice Brandeis cites Lord Hale's "Treatise on the Ports of the Sea" and McAllister's article, *supra,* and holds that the former could not have referred to limitations upon the legislative power of Parliament, for in. England Parliament was accustomed to regulate prices of commodities of all kinds.

*experimentation, our economic practices and institutions to meet changing social and economic needs.* I cannot believe that the framers of the Fourteenth Amendment, or the States which ratified it, intended to deprive us of the power to correct the evils of technological unemployment and excess productive capacity which *have attended progress in the useful arts.*

"*To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation.* . . . This *Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable.* We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. *But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.* (Page 311, italics ours.)

After this brilliant dissenting opinion by Mr. Justice Brandeis, and the preceding one by Mr. Justice Holmes in the *Tyson* case, the phrase "affected with a public interest" needed only a change in the personnel of the U. S. Supreme Court in order to have its correct interpretation prevail. Thus we find that in the case of *Nebbia* v. *N. Y., supra,* in sustaining the validity of a statute which fixed a minimum price for the sale of milk, the Court accepted that, as a general rule, the use of property and the making of contracts are normally free of governmental interference; but it held that neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows; that since time immemorial the power to promote the general welfare has been recognized as a power inherent in all governments, which, subject to constitutional restrictions, is superior to private rights; that the guaranty of due process of law—and this is fundamental—demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means

selected shall have a real and substantial relation to the object sought to be attained; that this being the test to be employed, it results that regulations valid for some purposes and businesses may be invalid for others, because the reasonableness of each regulation depends upon the relevant facts.

The Court then proceeds to answer the argument that the public control of rates or prices is *per se* unreasonable and unconstitutional, save as applied to businesses affected with a public interest, and that the milk industry is not one of those businesses. It accepts that the dairy industry is not, in the accepted sense of the phrase, a public utility; that no monopolistic practices prevail in said industry; that those engaged in it do not hold franchises granted by the State, and then it states:

"The thought seems nevertheless to have persisted that there is something peculiarly sacrosant about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the State is incapable of directly controlling the price itself. This view was negatived many years ago. *Munn v. Illinois*, 94 U. S. 113."

Here we find, then, embodied in the opinion of the majority of the Court, the doctrines which Holmes, Brandeis, and Stone had previously advocated. "Thus understood," says the Court, and this is the core of the opinion, " 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power'; and it is plain that *nothing more* was intended by the expression." (P. 533.) "The statement that one has dedicated his property to a public use is, therefore, merely another way of saying that if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue." (P. 533.) "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances

vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory.'' (P. 536.) (Italics ours.)

Referring then to the *Wolff, Tyson, Ribnik,* and *Williams* cases, *supra,* the Court makes the following statement:

"These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells." (P. 537.)

The Court, in the *Nebbia* case, *supra,* does not expressly overrule the *Tyson, Ribnik,* and *Williams* cases, wherein it was held that the businesses of ticket brokers, employment agencies, and sale of gasoline were not affected with a public interest, but it is equally obvious that it rejects the reasoning employed as a basis for those decisions. It should also be noted that the Court makes no mention of the decision in *New State Ice Co.* v. *Liebmann, supra,* but as note-writer Swellings suggests in 8 Tulane Law Rev. 442, 448, if one takes into consideration that the doctrine set forth is primarily based on the views advanced by Brandeis in his dissenting opinion in that case, it is reasonable to conclude that the *Liebmann* case has been overruled *sub silentio.*

Furthermore, in the case of *Olsen* v. *Nebraska,* 313 U. S. 236, which expressly overrules the *Ribnik* case and upholds the validity of a Nebraska statute fixing the maximum prices which an employment agency might charge for its services, it is made clear that the doctrine of the *Ribnik* case followed the view stated in the *Tyson* case, and that the *Williams* case, in turn, followed the doctrine of the *Ribnik* case, the Court then saying: "The *Ribnik* case, freed from the test which it employed, can no longer survive." (P. 246.) We are of the

opinion, therefore, that the *Tyson* and *Williams* cases have also been overruled *sub silentio.*

In accordance with the decision in the cases of *Nebbia* and *Olsen,* and following the doctrines set forth in the dissenting opinion of Mr. Justice Brandeis, we feel warranted in holding that there is no closed category of businesses affected with a public interest; what we do have is a broad field which the Legislature may enter by means of reasonable regulations for the protection of the public interest; and this intervention covers not only the sphere of public utilities proper, but also that of business in general. To this effect it has been suggested that the *"public interest test"* has been displaced by that of *"reasonable exertion of governmental authority,"* *Kent Stores of New Jersey* v. *Wilentz,* 14 F. Supp. 1, 10. It is fundamental, however, that what may be deemed reasonable regulation in regard to one industry might be unreasonable as to another. Each situation must be decided on its merits.

In sustaining Act No. 221, the lower court took into consideration the Oklahoma statutes which deal with the cotton industry and the decisions which interpret those statutes. We now proceed to consider them. Section 4, Chapter 20, Session Laws of 1915 of Oklahoma, declares cotton gins to be public utilities and their use a public business, prohibits gins from operating without a license from the State Corporation Commission; authorizes the Commission to refuse to grant such license when it does not find that the gin is needed in the locality; grants to the Commission the power to regulate the gins as to public duties and rates, and to correct abuses and discriminatory practices. The statute has been interpreted in the cases of *Sims* v. *State,* 196 Pac. 132; *Planters' Cotton & Ginning Co.* v. *West Bros.,* 198 Pac. 855; *Frost* v. *Corporation Commission,* 278 U. S. 515; *Chickasha Cotton Oil Co.* v. *Cotton County Gin Co.,* 40 F. (2d) 846. In the *Sims* case the court assumed the validity of the law

and upheld the power of the Commission to impose certain rates; in the *West Bros.* case the court again assumed the validity of the law and upheld the power of the Commission to order a company which had dedicated itself to serving the public to discontinue certain discriminatory and mono- politic practices; in the *Frost* case the Federal Supreme Court and the parties assumed the validity of the law; in the *Chickasha* case the court expressly upheld the validity of the law.

None of these cases decide the question raised by the case at bar, whether or not the appellant may be required to obtain a franchise, in accordance with the provisions of Act No. 221, when appellant argues that since "Central El Ejemplo" does not grind the public's cane, its business is not included among those dedicated to a public use. We are of the opinion that this argument cannot be sustained in view of the doctrines already stated. When a business is substantially affected with a public interest, whether or not it has been dedicated to a public use, this interest on the part of the community at large must prevail. Appellant admits the power of the Legislature to regulate its business in regard to prices, contracts, and wages and hours. Could there be any better indication of the public interest attendant upon the grinding by appellant of its own cane? Moreover, the appellant's mill is not dedicated to the manufacture or elaboration of sugar for its own consumption, but for sale in competition with the sugar produced by other sugar companies. On the industrial and economic activities of all these companies, including appellant, vitally depends the general welfare of a large portion of the community of Puerto Rico. It would be absurd to hold that the interest of the public in the sugar industry is limited solely to the grinding of cane by some mills, but not by others, depending on whether the cane to be ground belongs to the *colonos* or to the mills. As long as appellant dedicates itself to the cultivation and grinding of

cane for sale to the public of the sugar produced therefrom, all its activities are of interest to the public and therefore subject to reasonable regulation. No matter how small the link that "Central Ejemplo" may constitute in the chain of the sugar industry, this link has its proportional effect on the economy of the district wherein it is located and the country in general. To exclude appellant from the operation of Act No. 221 would be tantamount to an acknowledgment that such exclusion, in itself, may weaken the scope of the regulation that the Legislature sought to impose upon the entire sugar industry.

As was well said in the *Nebbia* case, when private interests are opposed to the public interest and subject only to constitutional guaranties, the public interest must prevail. "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases." (P. 527.) We find a similar statement in the case of *Frost* v. *Corporation Commission, supra,* p. 521, where, referring to the conditions existing in the cotton gin industry the Court said: "Under these conditions, to engage in the business is not a matter of common right, but a privilege." And the case decides that although the Oklahoma statute required a license, the privilege granted was, in effect, a franchise.

Recently, in the case of *Wickard* v. *Filburn,* 317 U. S. 111, the Federal Supreme Court has decided that Congress has the power to impose a wheat marketing quota on a farmer who only produced wheat for his own consumption, for the reason that said farmer was also a consumer, and if his needs were fully satisfied by his own production this fact tended to affect substantially the general scope of the statute. See also the cases of *Bandini Co.* v. *Superior Court,* 284 U. S. 8, and *Champlin Rfg. Co.* v. *Commission,* 286 U. S. 210, upholding the validity of statutes which curtailed production of gas and oil by private entities as measures for the conservation of the natural resources of the State.

In our judgment, the doctrines expounded in Mr. Justice Brandeis' dissenting opinion in *New State Ice Co.* v. *Liebmann, supra,* are the ones that must prevail in relation to the sugar industry in Puerto Rico. Moreover, even the opinion of the majority of the Court in said case upon striking down the statute made it clear that the ice industry was not *"a paramount industry upon which the prosperity of the entire state in large measure depends."* (Italics added.) Thus we see that Mr. Justice Brandeis, making use of this phrase, says that the conception of a public utility "is not static" and that the welfare of the community may require that the business of supplying ice be made a public utility "as well as the business of supplying water *or any other necessary commodity or service."* (Italics ours.) We believe that no one can doubt that the prosperity of all Puerto Rico depends, to a large extent, on the sugar industry. So that, not only on the basis of Mr. Justice Brandeis' dissenting opinion in the case, but even on the grounds stated by the majority of the Court, our acknowledgment of the power of the Legislature is justified. We again cite from Mr. Justice Brandeis' opinion in so far as he states the economic motives which made it reasonable to require a franchise in order to engage in the ice business:

"The purpose of requiring it (a franchise) is to promote the public interest by preventing waste. Particularly in those businesses in which interest and depreciation charges on plant constitute a large element in the cost of production, experience has taught that the financial burdens incident to unnecessary duplication of facilities, are likely to bring high rates and poor service. Their cost is usually dependent, among other things, upon volume; and division of possible patronage among competing concerns may so raise the unit cost of operating as to make it impossible to provide adequate service at reasonable rates."

The evidence in the case at bar showed that while appellant has a grinding capacity of 140,000 tons, it grinds only 90,000 tons. Here we have proof of the waste in appellant's

industrial capacity to which Brandeis called attention, which can be prevented by requiring appellant to obtain a franchise. And this is so if we take into consideration § 42 of Act No. 221[8], which compels the Public Service Commission to determine the production zone of every mill, it being its duty, according to § 43[9], to designate in the franchise issued to each mill said production zone. This determination is one of the fundamental bases of Act No. 221. Section 4 of the law defines the term "production zone" as "the territorial demarcation within the limits of which is cultivated the sugar cane which is to be converted into raw sugar or refined sugar, or where it is in effect converted into raw sugar or refined sugar by any sugar company or by any natural or artificial person engaged in Puerto Rico in the manufacture, production, processing, or refining of sugar."

Whether or not the determination of the production zone which may be assigned to appellant, when made by the Public Service Commission, as well as any other regulation or condition contained in the franchise, is reasonable, is a matter which, at the proper time, may be resolved by the courts. The fact that the appellant is required to ask for and obtain said franchise does not mean that it is equally required to accept any or all the terms and conditions that said franchise may contain. The legality of all regulation to which it may be subjected will always be subject to judicial investigation

[8] "Section 42.—Within one year counting from the date of approval of this Act, the Commission shall proceed to determine and to put in force the production zone of every sugar company and of every natural or artificial person who is engaged in Puerto Rico in the manufacture, processing, or refining of sugar.

".             .             .             .             .             .             ."

[9] "Section 43.—In every final franchise that the Commission may grant to any natural or artificial person or to any sugar company, the production zone of the entity the grantee of such franchise shall be determined and no natural or artificial person or sugar company may process or refine sugar using as raw material sugar cane produced outside of the production zone assigned to it in the franchise granted to it."

and decision. See *South P. R. Sugar Co.* v. *District Court,* decided January 19, 1944, 62 P.R.R. 811.

We have not failed to examine the decisions cited by appellant in relation to the lack of power on the part of the Legislature to convert a private business into a public one. The *Pipe Line Cases,* 234 U. S. 548; *Producers Transportation Co.* v. *R. R. Comm.,* 251 U. S. 228; *Weems Steamboat Co.* v. *People's Co.,* 214 U. S. 345, and others. However, we are of the opinion that the businesses and industries involved in those cases—pipe lines, docks, private carriers, etc.—of relative importance to the general economy of the State or Nation, are not analogous to the situation presented by the sugar industry of Puerto Rico. Furthermore, as has been said by Mr. Justice Stone, in which Mr. Justice Cardozo concurred: "The doctrine of *stare decisis,* however, appropriate and even necessary at times, has only a limited application in the field of constitutional law."[10]

Act No. 221, *supra,* is a sequel to the former limited regulation to which the same industry was subjected in regard to the relations, rights and duties of the mills to its *colonos.* We are referring to Act No. 112 of May 13, 1937, as later amended and now repealed by Act No. 221. The Legislature has tried to face the problem in full by converting the sugar manufacturing industry into a public service enterprise, subjecting it, in its entirety, to regulation by the Public Service Commission. In the exercise of this power, we are of the opinion that it has not violated the due process clause in our Organic Act.

The grinding of sugar cane is at present the principal industry of Puerto Rico. Our most vital economic problems generally turn and depend on the success or failure of said industry. It can be asserted that our economy depends, in a very substantial way, upon it. Act No. 221 is unquestionably a legislative experiment within the volume of modern

[10] *St. Joseph Stockyards Co.* v. *U. S.,* 298 U. S. 38, 94 (1936).

social legislation, which tends to modify the doctrine of *laissez faire*. Experience has shown, with painful and sometimes tragic results, that this doctrine has not adequately solved our serious and complicated social and economic problems. We also entertain no doubt that the success or failure of this experiment depends to the utmost extent, on the efficiency, honesty, and assiduity of those in whose hands it has been placed: the Public Service Commission. This is a problem, however, that must be faced by the executive branch of our government and not by the courts. Nor should the judicial branch hinder the Legislature when, in the exercise of its governmental or police power, it adopts that legislation which, in its judgment, may substantially solve those problems.

■ By the fourth assignment appellant urges that the lower court erred in granting the preliminary injunction because petitioner did not prove irreparable damages. This contention is without merit. We are not dealing with an injunction to be granted by the court in the exercise of equity powers, but one authorized by § 55 of Act 221, *supra*, which requires neither the alleging nor the proof of such damages, but only the determination of whether or not some person, natural or artificial, is violating the provisions of the statute of the Commission's orders, and the enjoining of further violations. See *U. S.* v. *San Francisco*, 310 U. S. 16, and *Brown* v. *The Hatch Co.*, decided July 22, 1943, by the Court of Appeals for the District of Columbia.

The judgment appealed from must be affirmed.